IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRIAN RUSSELL,                          :
                 Plaintiff         :
    v.                                  :        3:CV-06-1459
                           :        (JUDGE VANASKIE)
ALCOA, INC.,                            :
                Defendant          :

## MEMORANDUM

Plaintiff Brian Russell brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq., to recover long-term disability benefits under the Employee Group Benefits Plan ("the Plan") sponsored by Defendant Alcoa, Inc. ("Alcoa"). Before the Court are cross-motions for summary judgment.[1]  (Dkt. Entries 21, 24.)  Having reviewed the administrative record of the benefits decision under a slightly heightened arbitrary and capricious standard, I have concluded that the denial of benefits must be sustained.

## I. BACKGROUND

A.  Alcoa's Disability Plan

The Employee Group Benefits Plan of Alcoa, Inc. Plan I ("the Plan") provides long-term disability ("LTD") benefits to eligible participants.  The Plan designates Alcoa as the Plan Administrator and Sponsor.  (Plan, Dkt. Entry 23-4, at 10.)  The Plan Administrator is explicitly accorded the discretion:

_____

[1]This Court has jurisdiction over Plaintiff's ERISA claim pursuant to 28 U.S.C. § 1331.

to determine eligibility under all provisions of the plans; correct defects, supply omissions, and reconcile inconsistencies in the plans; ensure that all benefits are paid according to the plans; interpret plan provisions for all participants and beneficiaries; and decide issues of credibility necessary to carry out and operate the plans.

(Id.)  "It is undisputed that the Plan in this case gives discretionary authority to the fiduciary." (Pl.'s Br. Supp. Mot. Summ. J., Dkt. Entry 26, at 4.)  The Plan is funded by Alcoa, participating subsidiaries, and employee contributions.  (Plan, at 19; Aff. Frances C. Filipovits, Dkt. Entry 23-2, ¶ 5.)

Broadspire Services, Inc. ("Broadspire") is the third party Claims Administrator for the Plan.[2]  (Id. at ¶ 6.)  Broadspire investigates claims and makes initial claim determinations and first-level appeal determinations.  (Id. at ¶ 7.)  Broadspire receives the same compensation for its services whether long-term disability appeals are approved or denied.  (Id. at ¶ 8.)

If an initial appeal decision is adverse, a Plan participant may file a second and final appeal with Alcoa's Benefits Management Committee (BMC).  (Plan, at 20.)  The BMC has the right to interpret the terms of the plan as they relate to benefits, benefits payments, eligibility and eligible pay, and to make a final and binding determination.  (Id.)  The BMC has designated a separate Benefits Appeals Committee (BAC) to decide second and final level appeals.  (Aff.

---

[2]MetLife Disability was Claims administrator until January 1, 2005.  Broadspire (now Aetna Life Insurance Company) subsequently became the Claims Administrator.  (Aff. Frances C. Filipovits, at ¶ 6.)

Frances C. Filipovits, at ¶ 9.)  The BAC is made up of five current Alcoa employees who are participants in the Plan.  (Id.)  The members of the BAC do not participate in administration of the Plan and are paid no additional compensation for services rendered as BAC members. (Id.)  As part of the final and second appeal, Alcoa contracts with Evaluation Specialists, LLC, to select physicians who provide medical reviews.  (Id. at ¶ 10.)  According to Frances C. Filipovits, Alcoa's Life and Disability Benefits Manager, the physicians selected by Evaluation Specialists have no financial incentive to provide reviews favorable to Alcoa.  (Id.)

The Plan defines "totally disabled" as, because of injury or sickness, "for the first 24 months, you cannot perform each of the material duties of your regular job; and after the first 24 months, you cannot perform each of the material duties of any gainful occupation for which you are reasonably suited by training, education, or experience." (Plan, at 16) (emphasis added). Thus, the Plan applies a different standard to disability determinations based on the duration of an employee's incapacity – the "regular occupation" standard for the first two years, and the much more stringent "any occupation" standard thereafter.  (Def.'s Br. Supp. Mot. Summ. J, Dkt. Entry 23, at 5.; Plan, at 16.)

B.  Mr. Russell's Medical History

Brian Russell, a Plan participant by virtue of his employment as a crane operator for Alcoa, injured his right knee after tripping over a rug in a grocery store on March 3, 2001. (Administrative Record "AR," Dkt. Entry 20, at 470.)  At an examination on March 5, 2001,

3

Calvin D. Stoudt, D.O., Mr. Russell's primary orthopedist, diagnosed a sprain of his right knee and "possible internal derangement." (Id.)  Dr. Stoudt administered conservative treatment, referring Russell for pain management regarding complex regional pain syndrome.[3]  (Id. at 471.)

Mr. Russell visited other physicians with regard to his knee.  Dr. Robert Wilson, an osteopath, treated Mr. Russell on May 8, 2001, finding L6 radiculitis, possible neuropathic pain of the right knee, and sleep disturbance secondary to pain.  He essentially ruled out early complex regional pain syndrome, and recommended an epidural steroid injection and lumbar sympathetic blocks for both diagnosis and treatment.  (AR, at 389-390.)  Dr. Kevin P. Black, an Associate Professor in the Department of Orthopedics and Rehabilitation at Hershey Medical Center, on September 7, 2001, performed an examination and x-ray on Mr. Russell, diagnosing

---

[3]Complex regional pain syndrome (CRPS), formerly know as Reflex Sympathetic Dystrophy Syndrome (RSD),

is an uncommon, chronic condition that usually affects your arm or leg.  Rarely, the disease can affect other parts of your body. You may experience intense burning or aching pain along with swelling, skin discoloration, altered temperature, abnormal sweating and hypersensitivity in the affected area.

The nature of complex regional pain syndrome is puzzling, and the cause isn't clearly understood.

MayoClinic.com, Nervous System, Complex regional pain syndrome, http://www.mayoclinic.com/health/complex-regional-pain-syndrome/DS00265 (last visited March 28, 2008).

him with bilateral patellar instability.  (Id. at 405.)  He recommended continued rehabilitation, but also expressed concern "that there is an excessive subjective component to the patient's pain complaints." (Id. at 405.)  Dr. Carlos X. Villarreal, on April 5, 2001, after examining Mr. Russell's right lower extremity, reported that a Doppler study did not show evidence of deep vascular thrombosis.  (Id. at 376.)  Dr. Rajnish P. Chaudhry performed an EMG and MRI on Mr. Russell on April 27, 2001, finding normal EMG studies and an essentially unremarkable MRI of the spine.  (Id. at 378-379.)

Ms. Russell started to show improvement, but, in November of 2002, felt a pop in his right knee as he climbed out of the bath tub.  (Id. at 472.)  After an examination by Dr. Stoudt a week later, he was diagnosed with resolving complex regional pain syndrome, patellofemoral syndrome of the right knee, and ambulatory dysfunction.  (Id.)  Mr. Russell returned for a subsequent visit to Dr. Stoudt on September 16, 2002.  The diagnosis remained the same. (Id.)

Mr. Russell continued to work as a crane operator at Alcoa until August 5, 2003, when he represented that the pain he was experiencing rendered him unable to work and entitled him to LTD benefits under the Alcoa Plan.  MetLife disability, which administered the Plan for Alcoa at that time, concluded that Mr. Russell was unable to perform the duties of a crane operator for Alcoa.  Accordingly, he was awarded LTD benefits.

On December 30, 2003, Dr. Stoudt performed arthroscopic surgery on Mr. Russell's

right knee.  (AR, at 478.)  Over the ensuing months after Mr. Russell's surgery his condition improved, and Dr. Stoudt allowed him to return to work on full duty as of March 15, 2004.  (Id. at 479.)  On April 13, 2004, Mr. Russell reported that he had fallen in his home the previous day, re-injuring his right knee.  (Id. at 479.)  It does not appear that he actually returned to work for Alcoa.

While being treated by Dr. Stoudt, Mr. Russell also received medical attention from Don Ko, M.D.  At an examination on December 1, 2004, Dr. Ko thought there was a possibility of "reflex sympathetic dystrophy involving the right lower extremity. . . ."  At that time, Mr. Russell was taking Darvocet up to six times a day, Bextra, Tylenol and Albuterol for pain relief.  (AR, 024.)  In the "HISTORY OF PRESENT ILLNESS" part of his report, Dr. Ko stated that Mr. Russell "used to work at the Alcoa Company, however, at this time, he was unable to work." Lumbar sympathetic blocks, a type of pain treatment, were performed on December 22, 2004, and December 1, 2004.  (AR, at 032-34.)

On June 4, 2004, Mr. Russell saw his family doctor, James Langon, M.D., complaining of chest pain and shortness of breath.  (AR, at 054.)  After two subsequent visits on July 16, 2004, and August 20, 2004, Dr. Langon diagnosed Mr. Russell with bronchitis and emphysema. (Def.'s Answer to Pl.'s Statement of Material Facts ("SMF"), Dkt. Entry 31, at ¶ 53.)[4]  On a

_____

[4]In citing to Defendant's Answer to Plaintiff's Statement of Material Facts in this section, the Court only cites to those facts agreed upon by both parties.

follow-up visit in September 9, 2004, Dr. Langon reported that "[p]atient denies chest pain."

(AR, at 062.)  Dr. Langon further noted that there were no masses palpable, the extremity exam

was without clubbing, cyanosis, or edema, the skin was clear, dry, and intact, and there was full

range of motion at the hip, knee, ankle, shoulder, elbow, and wrist.  (Id.)

On August 17, 2004, Mr. Russell underwent a Functional Capacity Evaluation (FCE) at

the request of MetLife Disability.  (AR, at 321-26.)  The FCE concluded Mr. Russell had

functional limitations in the areas of position tolerance and mobility, namely, decreased muscle

strength in both upper and lower extremities, generalized de-conditioning, pain in the right knee

and generalized fatigue.  (Id. at 326.)  The discrepancy between job/occupational demands and

Mr. Russell's abilities was significant, making prognosis for return to his regular occupation

guarded.[5]  (Id.)  As to his ability to work at all, the evaluation recommended:

> it may be reasonable to allow the client to work at the light level of work for 3
> hours and 45 minutes and gradually increase the work hours to the 8 hour
> day as tolerated.  Alternatively, if allowed to work at the sedentary level, the
> client is likely to tolerate the 8 hour work day.

(Id.)

During the year 2004, Mr. Russell continued his regular post-surgery visits with Dr.

Stoudt.  At Mr. Russell's June 15, 2004 and July 27, 2004 visits, Dr. Stoudt noted post surgical

---

[5]Broadspire reviewed the FCE when considering Mr. Russell's eligibility for LTD benefits
under the any gainful occupation standard.  After inquiring about the evaluation, Broadspire
recorded that Mr. Russell "did not self-limit on any of tasks and gave 100%."  (AR, at 557.)

stiffness and weakness in the right lower extremity, ambulatory dysfunction, and residual pain.

(AR, at 315-16.)  In a letter to Mr. Russell's lawyer dated October 25, 2004, Dr .Stoudt

commented on Mr. Russell's condition:

> Whether this is permanent or temporary, is hard to say.  We have not seen
> the functional capacity test as of yet which would help with our determination.
> As far as whether he is permanent disability, that again is hard to say as well
> since I did not see anything inside his knee or any damage inside his knee
> that would cause permanent disability or dysfunction.  All of the majority of his
> symptoms appear to be subjective.  It is hard to say what his functional
> capacity or ability will be.

(Id. at 480.)

On Mr. Russell's November 10, 2004 visit, Dr. Stoudt observed patellofemoral syndrome

of the right knee, ambulatory dysfunction, and degenerative joint disease of the patellofemoral

joint.  (Id. at 317.)  Mr. Russell was scheduled for pain management, prescribed Mobic, and

allowed to work in a sedentary capacity only, avoiding excessive standing or walking, kneeling

or squatting, heavy lifting or carrying.  (Id.)  At his next visit, on December 22, 2004, Mr. Russell

was still experiencing pain and discomfort in his right knee, and having difficulty performing

daily activities.  (Id. at 318.)  He had attended two pain management sessions and had been

treated twice with ganglion blocks, but only showed minimal improvements.

Mr. Russell again visited Dr. Langon on January 5, 2005, this time for emphysema and

bronchitis.  (Id. at 065.)  Dr. Langon noted that Mr. Russell denied any chest pain and had full

movement of his knee.  (Id.)  The examination revealed no clubbing, cyanosis, or edema in Mr.

8

Russell's knee and that Mr. Russell had a full range of motion.  (Id.)  At that time, Mr. Russell was also being treated for two pleural masses, and possibly metastatic nodules in each lung, the nodes suggesting underlying processes.  (Id. at 517-18.)  Mr. Russell received another Lumbar sympathetic block treatment on January 15, 2005.  (AR, at 032.)

On February 8, 2005, Dr. Ko saw Mr. Russell for a follow-up regarding right lower extremity pain.  (Def.'s Answer to Pl.'s SMF, at ¶ 47; AR, at 029-030.)  Dr. Ko maintained the same diagnosis at this follow up visit as at the initial visit – Complex Regional Pain Syndrome Type I involving the right lower extremity, and lumbar facet disease.  (AR, at 029.)  He further observed that, after undergoing a series of lumbar sympathetic blocks, Mr. Russell had significant improvement in his right leg pain, as his pain level was a 2-3 out of 10, a mildly limited range of motion, and minimal dysthesia around the right knee.  (Id.)

Dr. Langon referred Mr. Russell to Dr. Lewis Ivor, who found Mr. Russell had a mass in his chest, and was suffering from backache and "post embolism" on May 20, 2005.  (Def.'s Answer to Pl.'s SMF, at ¶ 55.)  In addition to the Vicodin, Cymbalta and Tylenol that Mr. Russell was already taking for pain, Dr. Ivor prescribed Combivent, Nebulizer, DuoNeb and Avelox.  (Id.)  On September 19, 2005, Dr. Langon saw Mr. Russell for increased chest pain, which Mr. Russell described as a 9 out of 10.  (AR, at 73-74.)  Mr. Russell complained of pain in his right shoulder, neck and lung area, but not his right knee or leg.  (Id. at 74.)  Dr. Langon observed no joint deformities, effusion, inflammation, edema, skin discoloration, clubbing or cyanosis.  (Id.)

9

Along with his treatments by Drs. Ko, Langon, and Ivor, Mr. Russell continued to undergo treatments by Dr. Stoudt.  On a visit on January 21, 2005, Mr. Russell was doing significantly better, with less pain and discomfort about his right knee.  (Id. at 319.)  Dr. Stoudt characterized the injury as resolving complex regional pain syndrome of the right lower extremity.  (Id.)  A visit on March 10, 2005, found Mr. Russell with less pain, but still some discomfort and difficulty standing or walking.  (Id. at 320.) Mr. Russell was diagnosed as suffering from complex regional pain syndrome to the right lower extremity and chronic pain. (Id.)

In a letter dated June 3, 2005, Dr. Stoudt stated that Mr. Russell "would be a good candidate for vocational rehabilitation where he could learn to work with his mind and not with his body and try to avoid physical labor if at all possible." (Id. at 482.)  Later, in a letter dated August 29, 2005, Dr. Stoudt stated that Mr. Russell "is totally disabled and unable to do any type of work at the present time."[6]  (Id. at 483.)

C.  Mr. Russell's Disability Claim

Mr. Russell was found totally disabled from performing his job as a crane operator under the regular occupation standard of the Plan and received long-term disability benefits through the Alcoa plan for twenty-four (24) months, ending in August of 2005.  (AR, at 002 & 240; Def's

---

[6]Alcoa notes that there is no evidence in the record that Dr. Stoudt treated Mr. Russell at any time between his March 10, 2005 visit and the August 29, 2005 statement.  (Def.'s Answer to Pl.'s SMF, at ¶ 70.)

Answer to Pl.'s SMF, at ¶ 7; Def.'s Br. Supp. Mot. Summ. J., at 5.)  On March 15, 2005, before the two year period expired, Broadspire sent Mr. Russell a letter, informing him that his two years of benefits would expire on August 4, 2005, and that to continue to receive LTD benefits he would have to qualify as disabled under the heightened disability standard – "cannot perform each of the material duties of any gainful occupation for which you are reasonably suited by training, education, or experience." (AR, at 210.)

In evaluating Mr. Russell's eligibility under the heightened disability standard, Broadspire reviewed his FCE from August of 2004 and prepared an Employability Assessment Report, (AR, at 289-295), which identified five alternative occupations available to Mr. Russell: customer service representative, dispatcher, personnel clerk, medical secretary, and insurance claims processing clerk.  (Id. at 293.)  Broadspire also prepared a Labor Market Survey, which identified two job openings in the area.  (Id. at 298.)  Finally, Broadspire reviewed a report by Dr. Ira Posner, an Orthopedic Surgeon, who conducted a peer review of Mr. Russell's file on May 18, 2005.  (AR, at 300-302.)  Dr. Posner concluded:

> At this point in time he should certainly be capable of sustained work activity at least at the sedentary level and possibly light duty level.  He should avoid prolonged standing or walking or heavy lifting greater than 10-15 lbs.  The restrictions would be temporary in nature until his knee further improves.  As it improves and his complex regional pain syndrome resolves, he should be able to resume full work activities without any restrictions.

(Id. at 302.)

On August 22, 2005, Broadspire sent Mr. Russell a letter notifying him that his LTD

benefits had been terminated as of August 5, 2005.  (AR, 362-364.)  Broadspire had concluded,

at that point in time, that Mr. Russell "would be capable of sustained work activity at least at the

sedentary level and possibly at the light duty level."  (Id. at 363.)

Mr. Russell filed an appeal, appending the August 29, 2005 letter from his treating

orthopedist, Dr. Stoudt, indicating that he was "totally disabled and unable to do any type of

work at the present time."  (AR, at 366.)  As part of the first-level appeal process, Broadspire

obtained two additional independent peer reviews.  Dr. Martin Mendelsshon, an Orthopedic

Surgeon, conducted a record review on December 29, 2005, opining that Mr. Russell's "clinical

examination certainly reveals that his knee is functional and therefore functional impairment

that would preclude the claimant from any occupation from 8/5/2005 through present cannot be

substantiated."  (AR, at 488-491.)  Dr. Mendelssohn also noted that Mr. Russell had "a history

of chronic regional pain syndrome as well as unstable patella, had surgical intervention with

only temporary relief [and] is still symptomatic."  (AR, at 491.)

Dr Michael Goldman, with expertise in Physical Medicine and Rehabilitation, opined that

"[t]he medical documentation does not support a functional impairment from 8/5/2005 through

the present that would preclude the claimant from performing any occupation."  Both Doctors

Mendelssohn and Goldman, however, noted that a comprehensive neurological evaluation

would be helpful.  (Def.'s Answer to Pl.'s SMF, at ¶¶ 30-31.)  On January 11, 2006, Broadspire

denied Mr. Russell's appeal, determining "that there were insufficient findings to support a level

of functional impairment that would preclude (Mr. Russell) from performing each of the material duties of any occupation as of 08/05/05." (AR, 492-495.)

Mr. Russell then sought reconsideration of the appeal decision by Alcoa's BAC. (Def.'s Answer to Pl.'s SMF, at ¶ 12.)  In connection with this appeal, Victoria Langa, M.D., conducted a records review and concluded that "Mr. Russell is physically capable of performing full-time sedentary employment, and therefore does not meet the plan's definition of total disability beyond 08/04/05 ." (AR, at 11-15.)  Accordingly, in a letter dated April 27, 2006, the Alcoa Benefits Committee denied Mr. Russell's reconsideration of the appeal for long-term disability benefits. (AR, at 001.)  Thus, Mr. Russell exhausted the claims procedure available to him under the Alcoa Plan.  (Case Management Plan, Dkt. Entry 8, ¶ 1.41.)

In addition to his application for LTD benefits, Mr. Russell filed an application for Social Security disability benefits on July 27, 2004.  On April 10, 2006, just a few weeks before the Alcoa Benefits Committee denied Mr. Russell's second-level appeal, Administrative Law Judge Roger Schwartz approved Mr. Russell's application, finding him "disabled on August 4, 2003 because of a dislocated knee, emphysema, bullous disease and reflex sympathetic dystrophy so severe that your impairment(s) medically equal the requirements of one of the impairments listed in the Listing of Impairments." (Notice of Decision, Dkt. Entry 26-3, at 1; Def.'s Answer to Pl.'s SMF, at ¶ 14.)  It does not appear that the social security disability decision was made part of the administrative record on Mr. Russell's LTD claim.

## II. DISCUSSION

### A. Standard of Review

Mr. Russell initiated this action to recover LTD benefits under 29 U.S.C. § 1132(a)(1)(B).[7] In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held that a "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." When the language of a plan governed by ERISA accords the administrator discretionary authority to determine eligibility for benefits, judicial review of a decision to deny benefits is limited to ascertaining whether the denial is arbitrary and capricious.[8] See Vitale v. Latrobe Area Hosp., 420 F.3d 278, 281-82 (3d Cir. 2005); Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 44-45 (3d Cir. 1993). Under this standard, an administrator's decision "will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Vitale, 420 F.3d at 282 (quoting Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000)). As it is undisputed that the Plan in this case gives discretionary authority to the

---

[7]Section 1132(a)(1)(B) authorizes a benefit plan participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

[8]"The 'arbitrary and capricious standard' is essentially the same as the 'abuse of discretion' standard." Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 n.4 (3d Cir. 1993).

Plan Administrator, the arbitrary and capricious standard applies.  (Pl.'s Br. Supp. Mot. Summ.

J., Dkt. Entry 26, at 4.)

Consideration of the standard of review, however, does not end there, because "if a

benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of

interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of

discretion." Smathers v. Multi-Tool, Inc., 298 F.3d 191, 197 (3d Cir. 2002) (citing Firestone Tire

& Rubber Co., 489 U.S. at 115)) (citations omitted).  In Pinto v. Reliance Standard Life

Insurance Co., 214 F.3d 377, 387 (3d Cir. 2000), our Court of Appeals adopted a sliding scale

approach to decide to what degree a heightened arbitrary and capricious standard applies

when a conflict of interest is present.  "'[T]he arbitrary and capricious standard may be a range,

not a point . . . [it is] more penetrating the greater is the suspicion of partiality, less penetrating

the smaller that suspicion is.'"  Pinto, 214 F.3d at 392-393 (quoting Wildbur v. ARCO Chem.

Co., 974 F.2d 631, 638 (5th Cir. 1992)).  When a conflict exists, a "'heightened' form of review

is to be formulated on a sliding scale basis," reflecting the degree of conflict.  Stratton v. E.I.

DuPont De Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004).  The application of the

heightened arbitrary and capricious review requires a district court to "look not only at the result

– whether it is supported by reason – but at the process by which the result was achieved."

Pinto, 214 F.3d at 393.  Suspicious events rachet upward this sliding scale of review.  Id.

15

One type of conflict, "a structural conflict [,] arises when the administrator has a non-trivial financial incentive to act against the interests of the beneficiaries." Post v. Hartford Ins. Co., 501 F.3d 154, 162 (3d Cir. 2007). The dispositive inquiry is "whether the administrator's incentives make treating it as an unbiased fiduciary counterintuitive." Post, 501 F.3d at 163. (citing Pinto, 214 F.3d at 388). That is, the question is whether "the plan is set up so that the administrator has strong financial incentives routinely to deny claims in close cases. . . ." Id.

"[T]wo aspects of some plans' financial structure raise particular concern: (1) when a plan is funded on a case-by-case basis . . . and (2) when it is funded and administered by an outside insurer." Post, 501 F.3d at 163. Our Court of Appeals explained case-by-case funding as follows:

> Case-by-case funding simply means that the administrator pays claims out of its operating budget, rather than from segregated monies that the employer sets aside according to an actuarial formula. This raises concerns because it means that each dollar paid out is a dollar out of the administrator's pocket. Stratton, 363 F.3d at 254. Thus, the administrator has a financial incentive to deny claims.

Id.

Here, there is a structural conflict. Alcoa is both Plan Administrator and Plan Sponsor. The Plan is funded by Alcoa, participating subsidiaries, and employee contributions. Although it is unclear if Alcoa funds the plan on a case-by-case basis, the fact that Alcoa funds the plan, and no other details as to the method of funding are provided, causes this Court to increase the

16

standard of review, as Alcoa may have financial incentives to deny claims.[9]

This conflict, however, is ameliorated by the fact that Alcoa's Plan provides for an independent initial review and a two-tier appeal process.  The first appeal is to the third party claims administrator, Broadspire, which makes determinations and receives a service-based fee, no matter the outcome.  Broadspire's independent review provides a neutral safeguard, mitigating the inherent conflict in Alcoa's dual role.

The second and final level of appeal consists of a review conducted by a five-member panel of Plan participants, who receive no compensation for their decisions.  They have the right to interpret the terms of the plan as they relate to benefits, benefits payments, eligibility and eligible pay, and to make a final and binding determination. The fact that fellow workers make final, binding determinations provides a substantial safeguard, further mitigating Alcoa's conflict of interest.  The potential conflict of interest for these employees is slight, as they would seem to have an affinity towards employees and an interest in promoting plan benefits.  In contrast, reducing disability benefits would provide them little, if any, gain.  Thus, although the structure of the Plan initially creates a financial conflict, it is mitigated by the procedural

---

[9]Notably, "when the employer both funds and administers the plan, but pays benefits out of a fully funded and segregated ERISA trust fund rather than its operating budget, no structural conflict is created." Post, 501 F.3d at 165 n.6.  Here, there is no evidence of an ERISA trust fund.

safeguards placed in the appeal process.[10]

Plaintiff's argument that Broadspire is biased toward determinations in favor of Alcoa is unsupported.  Plaintiff suggests, referencing a Press Release, that Broadspire promises more favorable benefit plan determinations to clients.  The Press Release states that Broadspire "provide[s] clients with a distinct advantage clearly focused on driving down costs."[11]  (Press Release, Dkt. Entry 26-5, at 3.)  This statement, even if considered as admissible evidence, does not necessarily imply bias or self-interest on the part of Broadspire, nor does it create an inference of collusion between Broadspire and Alcoa.

Plaintiff argues that a "greatly increased level of scrutiny" is warranted in this case. (Pl.'s Answer to Def.'s SMF, Dkt. Entry 27, at ¶ 3; Pl.'s Br. Supp. Mot. Summ J., Dkt. Entry 26, at 4.)

_____

[10]In Pinto, the court identified the following factors as bearing on the standard of review: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the current status of the fiduciary and the stability of the employing company.  214 F.3d at 378.  Consideration of these factors seems to militate against heightening scrutiny: counsel represented plaintiff through the appeals process, Plaintiff admits that Alcoa and Broadspire's determinations were communicated to him in a timely fashion, (Pl.'s Answer to Def.'s SMF, Dkt. Entry 27, at ¶ 23), and there is no evidence of financial instability on the part of Alcoa that would call into question Alcoa's presumed desire to maintain employee satisfaction.  214 F.3d at 378, 392.

[11]Plaintiff's bring to the Court's attention a district court in the Eastern District of Pennsylvania that questioned Broadspire's impartiality.  See Davis v. Broadspire Services, Inc., Civil Action No. 05-5829, 2006 WL 3486464 (E.D. Pa. Dec. 1, 2006).  The court noted "parenthetically that there is no reason to assume that third-party claims adjudicators like Broadspire are always free from financial conflicts of interest."  Id. at *2.  However, Plaintiff must set forth some type of specific evidence of bias or bad-faith in order to merit an increased level of scrutiny.  See Employee Health & Welfare Plan v. Gourley, 248 F.3d 206, 216 (3d Cir. 2001).

"When there is a structural conflict of interest mitigated by independent claim evaluation and no procedural bias," however, the standard of review is heightened only slightly.  Post, 501 F.3d at 164 (citing Stratton, 363 F.3d at 254-256.)  This is the case here.

In addition to the structure of a plan, "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits" provide cause for heightened review.  Kosiba v. Merck & Co, 384 F.3d 58, 66 (3d Cir. 2004).  Such procedural irregularities may consist of inconsistent treatment of the same authority, requesting independent medical exams even though all evidence in a plaintiff's file indicates that plaintiff is disabled, and permitting the same individual to conduct both Plaintiff's first medical review as well as her appellate medical review.  Krensavage v. Bayer Corp., No. 02:04cv 1476, 2006 WL 279562, at *1 (W.D. Pa. Sept. 27, 2006), aff'd, No. 06-4302, 2008 WL 1778072 (3d Cir. Jan 22, 2008.)

Plaintiff asserts that the medical examiners who conducted the peer reviews were employees or agents of Broadspire.  (Pl.'s Br. Opp'n Mot. Summ. J., Dkt. Entry 28, at 3.)  For example, Plaintiff attempts to discredit Dr. Posner, who performed a peer review from the initial claim determination, alleging he worked exclusively for Broadspire and therefore had a vested interest.  To buttress his argument that Dr. Posner exclusively works for Broadspire, Plaintiff has submitted "Alumni Notes" from the Harvard Combined Orthopaedic Residency Program.  (Alumni Notes, Dkt. Entry 26-7 (noting that Dr. Posner "is currently doing peer review work for Broadspire.")  Even if this evidence were admissible, it does not necessarily follow that Dr.

19

Posner received compensation based on the outcome of his determinations, or that he was an agent or employee of Broadspire.  Thus, the Alumni Notes do not undermine Dr. Posner's opinion, or imply bias or prejudice on the part of Broadspire.

To undercut Dr. Langa's peer review decision, Plaintiff asserts that she relied on the previous peer reviews, implying that she did not fully consider the record or make her own independent analysis.   (Pl.'s Br. Supp. Mot. Summ. J., at 9.)  Her report indicates otherwise, as her five-page review analyzes Mr. Russell's medical history.  (AR, at 11-15.)

Plaintiff argues that another indication of bias was the failure of Broadspire and Alcoa to have Mr. Russell physically examined, despite their right to do so.  (Pl.'s Br. Supp. Mot. Summ. J., at 5.)  Although "ERISA does not require that plan administrators give the opinions of treating physicians special weight . . . courts must still consider the circumstances that surround an administrator ordering a paper review."  Post, 501 F.3d at 166 (citing Black & Decker Disability Plan, 538 U.S. at 823-24).  At the time of Dr. Posner's peer review, all the medical evidence in the record, including the FCE, showed that Mr. Russell could work at a sedentary level.  No doctor said he was unable to perform any occupation until Dr. Stoudt's letter.  The subsequent peer reviews seemed to discount Dr. Stoudt's letter due to a lack of specific orthopedic or neurological findings.  Considering these circumstances, it cannot be said that the peer reviews were conducted in bad faith or were biased.

Finally, Defendant has submitted the affidavit of Jacob Lazarovic, M.D., Broadspire's

20

Chief Medical Officer.  (Aff. Jacob Lazarovic, Dkt. Entry 34-2.)  Dr. Lazarovic states that Drs.

Posner, Goldman and Mendelssohn "are independent contractors who work for themselves or

some other entity," and were retained "as peer review physicians because of their medical

expertise." (Id. at ¶¶ 3 & 4.)  Moreover, "[t]he compensation they received for these

professional opinions was not outcome-dependent."  Plaintiff has not set forth competent

evidence to rebut this affidavit.

Plaintiff argues that the most "glaring irregularity" in this case is the omission from the

Administrative Record of the Administrative Law Judge's finding that Plaintiff was entitled to

social security disability benefits.  (Pl.'s Br. Mot. Summ. J., at 10.)  "While an SSA [Social

Security Administration] award may be considered as a factor in determining whether an ERISA

administrator's decision to deny benefits was arbitrary and capricious, it 'does not in itself

indicate that an administrator's decision was arbitrary and capricious, and [ ] a plan

administrator is not bound by the SSA decision.'"  Brandeburg v. Corning Inc. Pension Plan for

Hourly Employees, 243 F.App'x. 671, 674 n.3 (3d Cir. 2007); see Kustenaar v. Conn. Gen. Life

Ins. Co., 902 F.2d 181, 184 (2d Cir. 1990); Dorsey v. Provident Life & Accident Ins. Co., 167 F.

Supp.2d 846,856 (E.D. Pa. 2001).  Thus, the fact that it was not considered does not

necessarily undermine the review process or imply bias on the part of Broadspire.

In this regard, it is significant that the favorable social security ruling was made only a

few weeks before the second-tier appeal was rejected.  Alcoa points out that the ALJ's decision

was not made part of the ERISA LTD record.  Plaintiff, of course, shouldered the burden of

submitting the ALJ's determination.  The failure to address its significance in the ERISA

administrative process is thus attributable to the fact that it was not made part of the record.

Procedural irregularities relied upon by other courts in racheting up the level of scrutiny

do not exist here.  In Kosiba, 384 F.3d at 68, our Court of Appeals found a district court erred in

applying an unmodified arbitrary and capricious standard, when it should have applied a

moderate arbitrary and capricious standard.  Our Court of Appeals underscored the procedural

bias present on the part of the employer – intervening at the appeal stage "with a request for an

additional medical examination to be performed by a physician of its own choosing."  Id. at 67.

There is no such evidence in this case.  Broadspire solicited peer reviews at each stage of the

application process.  Moreover, at the final appeal stage, the BAC had Evaluation Specialists,

LLC, select physicians to provide medical reviews.

In short, recognizing Alcoa's dual role and considering the procedural safeguards in the

application process and the lack of evidence of conflict or bias, this Court will analyze the

Plaintiff's LTD benefits denial at the lower end of the arbitrary and capricious range, thereby

affording deference, but not absolute deference, to the BAC's final decision.  See Stratton v.

DuPont De Nemours & Co., 363 F.3d 250 (3d Cir. 2004) (employing a slightly heightened

arbitrary and capricious standard of review because a third party administrator initially heard the

claims, providing a safeguard of neutral evaluation).

22

B.  Analysis on the Merits

In arriving at its initial decision to deny LTD benefits, the plan administrator relied on the administrative record and on Dr. Posner's opinion that Plaintiff would be capable of work, at least at a sedentary level.  In the initial review, after recounting Plaintiff's medical history, Broadspire concluded:

> In summary, you are status post arthroscopy of the right knee with a complication of possible early complex regional pain syndrome that required three lumbar sympathetic blocks in the right lower extremity.  Your must recent exam is fairly benign in terms of the right knee.  It shows good range of motion, no local tenderness and mild antalgic gait.  Your MRI scan does not show any evidence of any abnormality.

(AR, 363.)  Broadspire further remarked that the FCE, performed in August of 2004, showed Plaintiff was capable of sustained work activity at the sedentary level.  (Id.)  These findings are supported by medical records found in the Administrative Record.

At the next level of appeal, Plaintiff added a letter to his file from Dr. Stoudt, stating he "is totally disabled and is unable to do any type of work at the present time."  (AR, 366.)  It is evident that Broadspire considered this new evidence, but did not find it credible.  In its denial letter, Broadspire noted that on June 3, 2005, Dr. Stoudt believed Mr. Russell could perform sedentary work, but that on August 29, 2005, Dr. Stoudt believed Mr. Russell was totally disabled.  (AR, 492-495.)  Broadspire questioned the August 29, 2005 statement because "Dr. Stoudt referenced no specific orthopedic or neurological dysfunctions that would impair Mr. Russell's ability to perform the material duties of any gainful occupation."  (Id.)  In addition,

Broadspire considered the opinions of two peer review physicians, who both concluded that there was not enough evidence that Mr. Russell was impaired from working at any occupation. Again, these determinations are supported by the record.  At the final appeal level, the BAC denied Mr. Russell's appeal, referencing the opinion of Dr. Langa, who found Mr Russell physically capable of performing full-time sedentary employment.

Plaintiff argues that "substantial and credible evidence in the record indicates that Plaintiff meets the definition of disabled." (Pl.'s Br. Mot. Summ. J., at 13.)  Defendant counters, however, that there is compelling medical evidence that demonstrates Mr. Russell's ability to work.  In this regard, "[c]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan, 538 U.S. at 834; see Schlegel v. Life Ins. Co. of North Am., 269 F. Supp.2d 612, 627-628 (E.D. Pa. 2003).

 Several doctors concluded that Plaintiff is able to work.  Furthermore, as Defendant observes, there is a plethora of medical documentation describing various conditions and diagnoses, but little of the data relate to Mr. Russell's functional abilities.  (Def.'s Br. Supp. Mot. Summ. J., at 21.)  Indeed, apart from Dr. Stoudt's letter in August of 2005, nothing in the record indicates that Plaintiff is disabled from any occupation or work.

With respect to the disagreements between physicians, "a professional disagreement

24

does not amount to an arbitrary refusal to credit." Stratton, 363 F.3d at 258.  Likewise, denial of benefits is not arbitrary and capricious under ERISA simply because of reliance on recommendations of non-treating physicians over treating physicians.  Id.  (citing Schlegel, 269 F. Supp. 2d at 627-28.)  Accordingly, the fact that Mr. Stoudt's opinion (the treating physician) conflicts with that of Drs. Posner, Mendelsshon, Goldman and Langa does not amount to an arbitrary refusal of benefits.

Finally, it does not appear that Alcoa unduly exerted its influence on the application process.  Even though Alcoa has financial incentives to deny claims, the fact that it is once removed from selecting the physicians during the initial determination and the first appeal, and twice-removed during the final appeal, supports the independence of the peer review doctors and the integrity of their opinions.

In sum, there is ample evidence in the record to support the determination that Mr. Russell is not totally disabled from engaging in any gainful occupation.  Considering all of the evidence under a slightly heightened arbitrary and capricious standard of review, I cannot find that the denial of benefits in this case was clearly unsupported by the evidence in the record.  See Stratton, 363 F.3d at 258.

III.  <u>CONCLUSION</u>

      For the reasons state above, Defendants Motion for Summary Judgment will be granted and Plaintiffs Motion for Summary Judgment will be denied.  An appropriate order follows.

<u>s/ Thomas I. Vanaskie</u>        
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRIAN RUSSELL,                          :
                    Plaintiff           :
      v.                                :          3:CV-06-1459
                                        :          (JUDGE VANASKIE)
ALCOA, INC.,                            :
                    Defendant           :

<u>ORDER</u>

NOW, THIS 31st DAY OF MARCH, 2008, for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED THAT:

1.  Defendant's Motion for Summary Judgment (Dkt. Entry 21) is GRANTED.

2.  Plaintiff's Motion for Summary Judgment (Dkt. Entry 24) is DENIED.

3.  The Clerk of Court is directed to mark this matter CLOSED.


                              s/ Thomas I. Vanaskie
                              Thomas I. Vanaskie
                              United States District Judge